UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

VETERAN'S TRANSPORTATION
SERVICES,
    Plaintiff and
    Defendant in Counterclaim,

v.                           CIVIL ACTION NO.
                                 19-11019-MBB

TEAMSTERS LOCAL UNION NO. 25,
    Defendant and
    Plaintiff in Counterclaim.

**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOCKET ENTRY # 16);**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM**
**(DOCKET ENTRY # 15)**

**November 25, 2019**

**BOWLER, U.S.M.J.**

This case arises from an arbitration dispute between plaintiff Veteran's Transportation Services ("VTS") and defendant Teamsters Local Union No. 25 ("the Union" or "defendant") after VTS terminated one of its employees, Union-member Cathy LeBlanc ("LeBlanc"), for alleged work rule violations.  VTS asserts, inter alia, the arbitrator exceeded the scope of his authority under the plain language of a Collective Bargaining Agreement ("the CBA" or "the agreement") when he reinstated LeBlanc with full seniority and ordered she receive backpay.  VTS argues this action violated Massachusetts General Laws chapter 150C ("chapter 150C"), section 11(a)(3)

("section 11(a)(3)"), which states that an arbitrator exceeds his authority if he issues an award requiring a person to commit an act or "engage in conduct prohibited by state or federal law." (Docket Entry # 6, p. 30). VTS also argues this court should vacate the arbitration award ("the award") pursuant to chapter 150C, section 11(a)(4) ("section 11(a)(4)"), "because the Arbitrator refused to hear evidence material[] to the controversy." (Docket Entry # 6, p. 30).

The Union disagrees. After receiving a favorable award from the arbitrator, which VTS refused to comply with, the Union filed a counterclaim on May 21, 2019 asking this court to confirm and enforce the March 15, 2019 award. (Docket Entry # 7).

Pending before this court are VTS's motion for summary judgment (Docket Entry # 16) and the Union's motion for summary judgment on the counterclaim (Docket Entry # 15), or in the alternative, summary judgment. This court has jurisdiction to review contractual disputes between an employer and a labor organization pursuant to section 301(a) of the Labor Management Relations Act of 1947 ("the LMRA"), 29 U.S.C. § 185(a).

<u>STANDARD OF REVIEW</u>

The purpose of summary judgment is "to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" <u>Tobin</u>

2

v. Fed. Express Corp., 775 F.3d 448, 450 (1st Cir. 2014)
(internal citations omitted).  It is appropriate if "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate "if
the record is sufficiently open-ended to permit a rational
factfinder to resolve a material factual dispute in favor of
either side."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301
(1st Cir. 2014) (internal citations omitted).

"An issue is 'genuine' when a rational factfinder could
resolve it [in] either direction," and a "fact is 'material'
when its (non)existence could change a case's outcome."  Mu v.
Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (internal
citation omitted); accord Green Mountain Realty Corp. v.
Leonard, 750 F.3d 30, 38 (1st Cir. 2014).  The record is viewed
in favor of the nonmoving party, and reasonable inferences are
drawn in the nonmoving party's favor.  See Garcia-Garcia v.
Costco Wholesale Corp., 878 F.3d 411, 417 (1st Cir. 2017) (court
examines "'record in light most favorable to the nonmovant' and
must make 'all reasonable inferences in that party's favor'")
(internal citations omitted); accord Ahmed v. Johnson, 752 F.3d
490, 495 (1st Cir. 2014).  "'"[C]onclusory allegations,
improbable inferences, and unsupported speculation"'" are

ignored.  <u>Garcia-Garcia v. Costco Wholesale Corp.</u>, 878 F.3d at

417 (internal citations omitted).

Local Rule 56.1 requires a moving party to "include a

concise statement of the material facts of record as to which

the moving party contends there is no genuine issue to be tried"

with citations to the record.  LR. 56.1.  The nonmoving party

must set out his or her own statement with citations to the

record showing "there exists a genuine issue to be tried."  LR.

56.1.  Unless the nonmoving party's statement controverts the

moving party's statement, the moving party's facts are "admitted

by [the] opposing part[y]."  LR. 56.1; <u>see</u> <u>Cochran v. Quest</u>

<u>Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's

failure to contest date in LR. 56.1 statement of material facts

caused date to be admitted on summary judgment); <u>see</u> <u>also</u>

<u>Stonkus v. City of Brockton Sch. Dep't</u>, 322 F.3d 97, 102 (1st

Cir. 20003) (citing LR. 56.1 and deeming admitted undisputed

material facts plaintiff failed to controvert).

FACTUAL BACKGROUND

Under the CBA, the parties agreed to resolve disputes

arising from the CBA through arbitration.  (Docket Entry # 17-1,

p. 6)[1] (Docket Entry # 17-9).  The relevant provision reads as

follows: "In the event that the parties fail to resolve the

---

[1]  Page numbers refer to the page number in the upper right-hand
corner of the docketed filing.

4

grievance . . . the Union may submit the grievance to arbitration . . .." (Docket Entry # 17-1, p. 6) (Docket Entry # 17-9, p. 13). Thus, "it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987); see also Steward Holy Family Hosp., Inc. v. Mass. Nurses Ass'n., 932 F.3d 14, 15 (1st Cir. 2019) ("'arbitrator's factual findings are not open to judicial challenge'") (citing El Dorado Tech. Servs., Inc. v. Union Gen. de Trabajadores de P.R., 961 F.2d 317, 320 (1st Cir. 1992)). Accordingly, this court must accept the arbitrator's findings of fact as described in his award.

A.  The CBA

Denoted as "Discharge and Suspension," article ten of the CBA provides in pertinent part: "The right to discipline, suspend or discharge employees shall remain in the sole discretion of the Employer.  However, the Employer shall not discipline, suspend, or discharge any employee . . . without just cause." (Docket Entry # 17-1, p. 7) (Docket Entry # 17-9, p. 14).

As determined by the arbitrator, at the time of her discharge, LeBlanc, whose employment was subject to the CBA, had been employed since May 2016 by VTS as a full-time sedan driver in the Massachusetts Bay Transit Authority ("MBTA") "RIDE

program." (Docket Entry # 17-1, p. 5). The RIDE program provides public transportation in greater Boston to individuals with disabilities and is governed by a contract between the MBTA and VTS ("MBTA contract").[2] VTS guaranteed compliance with MBTA safety protocol as part of its obligations under the MBTA contract and, in order to ensure such compliance, developed and adopted the VTS RIDE Driver Work Rules ("work rules"). (Docket Entry # 17-8). All employees are subject to the work rules. Among these work rules are article four (Standards of Conduct) and article seven (Safe Transport Policy). Should an employee violate one of the work rules, the work rules set out an action plan for employee discipline up to and including a discharge, dependent upon the severity of the incident, the number of infractions, "and whether the [incident] is the fault of the driver or the result of [a] passenger complaint." (Docket Entry # 17-1, p. 11) (Docket Entry # 17-8). When provisions of the MBTA contract and the CBA conflict, as VTS alleges here, the provisions of the MBTA contract control. (Docket Entry # 17-1, p. 7). In no uncertain terms, the CBA states that, "Nothing in this agreement shall nullify or contradict any provision, procedure, rule, regulation, guideline, directive, or mandate

---

[2] As explained in detail below, VTS argues that the MBTA contract restricts LeBlanc's grievance rights under the CBA. (Docket Entry # 17-1, p. 14).

contained in, promulgated pursuant to, or mandated pursuant to, the contract [sic] the MBTA and the employer." (Docket Entry # 17-1, p. 7) (Docket Entry # 17-9, p. 14).

Furthermore, when there is a conflict between provisions of the MBTA contract and the CBA, the Union may only grieve "as to the issue of whether the discipline[d] employee has committed a violation."[3] (Docket Entry # 17-1, p. 7) (Docket Entry # 17-9, p. 14). The arbitrator did not expressly state that there was no conflict between the two contracts. He did, however, determine that this case "concerns a question of just cause discharge." (Docket Entry # 17-1, p. 19).

VTS takes the position that LeBlanc should only be allowed to grieve the issue of whether the alleged incidents occurred. It argues that Union grievance rights must be limited to ensure compliance with the safety provisions in the MBTA contract. It also maintains that more expansive grievance rights on behalf of Union members would result in a breach of the MBTA contract

---

[3] The relevant language in the CBA reads as follows:

Where a conflict does exist, said provision, procedure, rule, regulation, guideline, directive, or mandate shall take precedence over the collective bargaining agreement, and any discipline pursuant to said provision procedure, rule, regulation, guideline, directive, or mandate, may only be grieved as to the issue of whether the disciplined employee has committed a violation.

(Docket Entry # 17-1, p. 7).

7

(Docket Entry # 17, p. 5). VTS asserts the arbitrator's award cannot stand because his decision to reinstate LeBlanc was not limited to whether the incidents occurred, but instead considered whether VTS violated the just cause provision of the CBA, thereby disregarding the conflict that existed between the CBA and the MBTA contract. (Docket Entry # 17, pp. 1-2).

B. The Discharge

VTS cites LeBlanc's involvement in three automobile incidents occurring on July 17 and July 19, 2018 as cause for termination pursuant to the work rules. Although disputed by defendant, VTS submits at least two of these incidents were demonstrably "at fault." (Docket Entry # 17-1, pp. 5, 10, 15-19). VTS points to LeBlanc's prior involvement in ten other incidents (Docket Entry # 17-1, p. 10) to argue that discharge was the appropriate discipline under the circumstances because she allegedly violated VTS's Safe Transport Policy work rule as it relates to at-fault incidents. (Docket Entry # 17-1, pp. 11, 15). VTS also points to the prior progressive discipline that it imposed, including multiple suspensions, as evidence that a discharge was necessary because the prior discipline failed to make LeBlanc a safer driver. (Docket Entry # 17, pp. 18-19). After the three incidents in July, which resulted in the destruction of two sedan tires and the rear-ending of another vehicle, VTS investigated the incidents. The investigation

eventually led to LeBlanc's termination.  VTS delivered LeBlanc
a termination letter to her home address on August 4, 2018.
(Docket Entry # 17-1, p. 17).

After the discharge, the Union filed a grievance on
LeBlanc's behalf arguing that VTS terminated her without just
cause in violation of article ten of the CBA.  (Docket Entry #
17-1, p. 19).  The Union points to inconclusive evidence
regarding whether the incidents occurring in July were LeBlanc's
fault, relying heavily on the fact that she "was affected
mentally and physically by an adverse reaction to a medicine"
prescribed to her.  (Docket Entry # 17-1, pp. 12, 18).  The
Union also cites failures by VTS to follow certain grievance
procedures required under the CBA, most notably, the requirement
that a Union steward accompany her during the termination
procedures.  (Docket Entry # 17-1, pp. 6, 17-18).

C.  The Arbitrator's Award

This case went through each step of the grievance procedure
and was eventually submitted to the American Arbitration
Association ("AAA") for appointment of an arbitrator.  The
question submitted to the arbitrator asked: "Did the Company
violate the Collective Bargaining Agreement, specifically
Article 10 by terminating Cathy LeBlanc for just cause?  If not,

what is the appropriate remedy?"[4]  (Docket Entry # 17-1, p. 3).

A hearing took place in Boston on January 11, 2019.  Each side

submitted joint and separate exhibits and called on witnesses in

front of the arbitrator.  (Docket Entry # 17-1, p. 5).  In the

analysis, the arbitrator stated this case "concerns a question

of just cause discharge."  (Docket Entry # 17-1, p. 19).  In the

award, he then cited the "seven tests" for just cause in

---

[4]  VTS denies it agreed to this submission with the Union and
argues that the Union alone submitted this issue to the
arbitrator.  (Docket Entry # 20, pp. 1-2).  The argument assumes
that by not agreeing to the issue submitted for arbitration, VTS
is not bound by the arbitrator's award resulting therefrom.
However, by participating in the arbitration and by failing to
raise this procedural error to the arbitrator during the hearing
process, VTS waived the ability to argue on summary judgment
that there was a procedural error concerning issue submission.
See Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)
("procedural questions which grow out of the dispute and bear on
its final disposition are presumptively *not* for the judge, but
for an arbitrator, to decide") (internal citation and quotation
marks omitted) (emphasis in original); see also Ren Elecs. Corp.
v. Local 208, Int'l Union of Elec., Radio and Mach. Workers,
AFL-CIO, 665 F. Supp. 77, 81 (D. Mass. 1987)("a party 'cannot
remain silent, raising no objection during the course of the
arbitration proceeding, and when an award adverse to him has
been handed down complain' about procedural errors") (quoting
Cook Indus., Inc. v. C. Itoh & Co. (America), Inc., 449 F.2d
106, 107-08 (2nd Cir. 1971)).  Accordingly, the procedural issue
raised by VTS is not an issue this court should address.
Furthermore, even if VTS could raise procedural errors to this
court, its defense on that ground would fail because the Union
did not circumvent the procedures enumerated in article eight of
the CBA.  Step three of the Grievance and Arbitration procedures
explicitly grants to the Union the authority to submit the
grievance to arbitration.  The relevant language reads as
follows: "In the event that the parties fail to resolve the
grievance at Step II of this procedure the Union may submit the
grievance to arbitration as set forth below."

disciplinary cases,[5] and determined that two of them, "Fair Investigation" and "Equal Treatment," were important to apply in considering whether LeBlanc was correctly terminated under the Discharge and Suspension provision of article ten. (Docket Entry # 17-1, p. 20). The arbitrator concluded VTS failed to satisfy its burden with respect to both Fair Investigation and Equal Treatment and therefore failed to establish just-cause termination. (Docket Entry # 17-1, p. 20).

Regarding Fair Investigation, the arbitrator determined that VTS failed to question LeBlanc about any of the allegations VTS lodged against her (Docket Entry # 17-1, p. 20), and thus failed to conduct a "full investigation" of the alleged incidents. In the arbitrator's judgment, VTS cannot establish just cause without first conducting a full investigation of the alleged at-fault incidents. (Docket Entry # 17-1, p. 20).

---

[5] More specifically, the arbitrator elaborates the following concerning just-cause termination:

> The citing of just cause dates back to 1966 when arbitrator Carroll R Daugherty, in the Enterprise Wire Company Case (46 LA 359) developed seven tests for just cause in disciplinary cases. In fact, he stated all seven tests had to be satisfied and the burden was on the management to approve each one . . . [i]n this case, a Fair Investigation and Equal Treatment are important elements in determining whether the grievant, Cathy LeBlanc was terminated correctly under Article 10 Discharge and Suspension in the present Collective Bargaining Agreement.

(Docket Entry # 17-1, p. 20).

Second, citing LeBlanc's unmet request to have a union steward provided at the August 2, 2018 termination meeting, the arbitrator concluded LeBlanc was not given full "Weingarten Representation Rights" as required by Nat'l Labor Relations Bd. v. J. Weingarten, Inc., 420 U.S. 251 (1975), and therefore not given Equal Treatment. (Docket Entry # 17-1, p. 20). Based on these findings, the arbitrator upheld the grievance and required VTS to reinstate LeBlanc with full seniority and backpay for all lost wages and benefits dating back to August 30, 2018, the date when she was medically cleared to return to work. (Docket Entry # 17-1, p. 20).

After issuance of the award, VTS filed a motion for clarification related to LeBlanc's lost wages and argued they should have been offset by income earned while LeBlanc was employed elsewhere. The arbitrator agreed. After he reviewed LeBlanc's income records, he ordered her back wages "mitigated by the money she earned [while working] at the Market Basket Supermarket." (Docket Entry # 17-15, p. 3).

On March 12, 2019, VTS filed a motion to reopen the arbitration hearing after it learned about an additional incident involving LeBlanc through evidence previously unavailable at the time of the initial hearing. VTS argued it was unaware of the incident because LeBlanc allegedly failed to report it to the appropriate authority, which, VTS argues,

purportedly is a clear violation of the work rules.

Notwithstanding VTS's allegation, the arbitrator chose not to

reopen the hearing.  Shortly thereafter, VTS filed an

application to vacate the award in Massachusetts Superior Court

(Suffolk County) arguing the award should be vacated pursuant to

sections 11(a)(3) and 11(a)(4) of chapter 150C.  (Docket Entry #

6).  The Union then removed the case to this court pursuant to

section 301(a) of the LMRA seeking enforcement of the award.

This court reviews the arbitrator's award pursuant to the

authority granted by the LMRA, 29 U.S.C. § 185(a).

## DISCUSSION

A.  <u>District Court Review of Arbitration Awards</u>

Only in rare instances will a district court overturn an

arbitrator's award.  <u>See</u>, <u>e.g.</u>, <u>Salem Hosp. v. Mass. Nurses

Ass'n</u>, 449 F.3d 234 (1st Cir. 2006).  Because arbitral

construction of the CBA was bargained for by the parties, "[t]he

hallmark of federal court review of an arbitrator's decision is

extreme deference to the opinion of the arbitrator."  <u>Id.</u> at

237; <u>see</u> <u>Steward Holy Family Hosp.</u>, 932 F.3d at 17 ("[w]e have

labelled the degree of deference that we afford an arbitrator's

interpretation of the governing arbitration agreement as

'extreme'") (internal citation omitted); <u>see</u> <u>also</u> <u>Salem Hosp.</u>,

449 F.3d at 237-38 ("[j]udicial review of an arbitration

decision is extremely narrow" and "is among the narrowest known

13

in the law") (internal citations and quotation marks omitted).

If federal courts had the final say on the merits of the award,

"[t]he federal policy of settling labor disputes by arbitration

would be undermined." United Steelworkers of Am. v. Enter.

Wheel and Car Corp., 363 U.S. 593, 596 (1960). Therefore, "the

refusal of courts to review the merits of an arbitration award

is the proper approach to arbitration under collective

bargaining agreements." Id.

It is the arbitrator's job to determine the facts and

interpret the CBA, and a reviewing court may not discard the

award should it disagree with the conclusions of the arbitrator.

Misco, Inc., 484 U.S. at 38. The Court in Misco held that "an

arbitrator must find facts and a court may not reject those

findings simply because it disagrees with them. The same is

true of the arbitrator's interpretation of the contract." Id.

The extreme arbitral deference recognized in Misco is part of a

long-standing tradition. Two decades earlier, the Court in

Enter. Wheel and Car Corp. held that arbitral interpretation of

CBAs is rarely, if ever, open to judicial review:

> [T]he question of interpretation of the collective
> bargaining agreement is a question for the arbitrator. It
> is the arbitrator's construction which was bargained for;
> and so far as the arbitrator's decision concerns
> construction of the contract, the courts have no business
> overruling him because their interpretation of the contract
> is different from his.

Enter. Wheel and Car Corp., 363 U.S. at 599.  However, despite

strong judicial deference to the arbitrator, his power is not

unlimited.  His interpretations and applications are confined to

the CBA, and he "cannot . . . ignore the contract and simply

dispense his own brand of industrial justice" as he sees fit.

Steward Holy Family Hosp., 932 F.3d at 17-18 (internal citations

and quotation marks omitted).  The principle question when

reviewing an award is whether the arbitrator's findings and

construction are plausibly based on a reasonable interpretation

of the CBA rather than a manifestation of industrial justice in

the mind of the arbitrator.  See, e.g., id.

     In sum, "[i]f an arbitration award rests on a plausible

interpretation of the underlying contract, we must uphold it."

Id. (quoting Salem Hosp., 449 F.3d at 237); see also El Dorado

Tech. Servs., 961 F.2d at 319.  "Improvident, or even silly,

factfinding is not sufficient grounds to overturn an

arbitrator's award."  Brigham & Women's Hosp. v. Mass. Nurses

Ass'n, 684 F. Supp. 1120, 1123 (D. Mass. 1988).

B.  Application

     The arbitrator's decision is plausibly based on an

interpretation of the CBA.  As stated by the arbitrator: "[t]his

case concerns a question of just cause discharge."  (Docket

Entry # 17-1, p. 19).  For the arbitrator to arrive at that

conclusion, he must first have looked to the language of article

ten, Discharge and Suspension, and determined no conflict
existed between the CBA and the MBTA contract, specifically,
between VTS's exclusive right to discharge an employee for
violating provisions of the work rules and the CBA provision
requiring an employer to establish just cause prior to
terminating an employee.  It is true that the arbitrator did not
expressly state there was no conflict in his analysis, but the
absence of a justification or an explanation is not a ground to
assume the arbitrator disregarded this critical step or, as VTS
does, that his ultimate decision was not grounded in the CBA.
As stated in Enter. Wheel and Car Corp., "[a] mere ambiguity in
the opinion accompanying an award, which permits the inference
that the arbitrator may have exceeded his authority, is not a
reason for refusing to enforce the award.  Arbitrators have no
obligation to the court to give their reasons for an award."
Enter. Wheel and Car Corp., 363 U.S. at 598.

VTS's argument assumes "the Union's right to file a
grievance is limited to whether the employee committed the
alleged violation."  (Docket Entry # 17-1, p. 14).  That
assumption, however, is valid only if the arbitrator determined,
based on the relevant language, that there existed a conflict
between the two contracts.  A careful reading of the
arbitrator's award suggests he understood the arguments
presented by both parties.  He dedicated multiple pages of

explanation to a detailed review of each side's position, and there is simply no evidence in support of VTS's assertion that he disregarded the plain language of article ten.  There is also insufficient information in the record to suggest the arbitrator did not understand his duties, or that he was incapable of making logical inferences while tasked with interpreting the CBA.  Only if the arbitrator found a conflict between the two agreements would he then be forced to limit his inquiry to whether the incidents alleged by VTS occurred in fact.  Because he did not make such a finding does not mean his award must now be vacated.

Moreover, even if this court disagreed with the arbitrator's interpretation of the CBA, that fact alone would not suffice to vacate his award.  Overturning an arbitrator's contractual interpretation would be an excess of judicial power under the limited authority of the LMRA and controlling precedent where a court "can find, within the four corners of the agreement, any plausible basis for that interpretation."  El Dorado Tech. Servs., 961 F.2d at 319.  "[A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision."  Misco, 484 U.S. at 38.

C.  Public Policy

VTS's next argument concerns public policy.  VTS's position is that compliance with the arbitrator's award (reinstating LeBlanc with backpay) violates public policy and therefore must be vacated pursuant to section 11(a)(3).

An arbitrator tasked with interpreting a CBA is acting within the bounds of limited authority granted by the parties. His views regarding his jurisdictional review may preclude consideration of questions concerning public policy.  See, e.g., W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 766 (1983). That said, "the question of public policy is ultimately one for resolution by the courts."  Id.

The public policy exception is rooted in basic contract principles.  As the Supreme Court stated in Misco, "[a] court's refusal to enforce an arbitrator's award under a collective-bargaining agreement because it is contrary to public policy is a specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy."  Misco, 484 U.S. at 42.  The public policy exception is limited to instances "'where the contract as interpreted [by the arbitrator] would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'"  Bos. Med. Ctr. v. Serv. Employees Int'l Union,

Local 285, 260 F.3d 16, 23 (1st Cir. 2001) (quoting Misco, 484
U.S. at 43) (brackets in original).

According to VTS, the arbitrator's decision to reinstate
LeBlanc violated an established public policy aimed at ensuring
rider safety, because, to effectuate that policy, only competent
public transit drivers may participate in the RIDE program, and
LeBlanc's prior actions as a sedan driver demonstrate she is
incompetent and perhaps even dangerous to the public. (Docket
Entry # 17, p. 15). VTS submits it is required to make safety a
priority pursuant to the MBTA contract, and thus the right to
discharge an employee within ten days' notice is reserved
exclusively to the employer if a pattern of reckless driving by
an employee persists. (Docket Entry # 17, p. 15).

There is no question the Commonwealth of Massachusetts is
concerned with both the safety of passengers on board public
transportation and the safety of the public. The question
concerning this court, however, is not whether LeBlanc's
underlying conduct violated a general public policy aimed at
ensuring rider safety, but instead whether *the order to
reinstate her* violated that policy. See E. Associated Coal
Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62-
63 (2000). "To put the question more specifically, does a
contractual agreement to reinstate [the employee] with specified
conditions . . . run contrary to an explicit, well-defined, and

dominant public policy, as ascertained by reference to positive law." Id. at 63. In the case at bar, the answer to that question is no. If, for example, LeBlanc's reckless driving resulted in a suspended license imposed as discipline by the Commonwealth and she was subsequently terminated by VTS, then an arbitrator could not, as part of his award, reinstate her while her license was suspended. This is true because such an award is a clear violation of positive law requiring all drivers in Massachusetts to have a valid driver's license issued by the state registrar prior to operating a motor vehicle. See Mass. Gen. Laws ch. 90, § 10 ("No . . . person shall so operate [a motor vehicle] unless licensed by the registrar . . ..."). VTS cites no statute or regulation prohibiting reinstatement of LeBlanc simply because she was involved in multiple at-fault accidents. Instead, it submits its obligations under the MBTA contract is evidence of a strong public policy ensuring rider safety on public transportation. The argument is misguided.

Moreover, employee error substantially more severe than LeBlanc's has not been enough for the public policy exception to apply, even where the grievant, like LeBlanc, had a blemished employee record. The First Circuit in Boston Medical Center refused to apply the public policy exception after a clinical misjudgment by a nurse resulted in the death of an infant assigned to the nurse's care. Bos. Med. Ctr., 260 F.3d at 25.

In concluding that the public policy exception did not apply, the court stated, "we acknowledge that there might be conduct so egregious that reinstatement might threaten the general public policy promoting the competence of nurses and patient safety . . . [b]ut this is not such a case." Boston Med. Ctr., 260 F.3d at 25. The arbitrator in that case explained in her decision, "'[t]he deficiencies in the [nurse's] standard of care appear to be due to clinical misjudgments, not malice, amenable to correction through supplemental education and training.'" Id. (quoting arbitrator's decision). Here, the less egregious facts as found by the arbitrator likewise do not give rise to a public policy violation. Additionally, because VTS's contract with the MBTA is not proof of a public policy, VTS otherwise fails to offer evidence in support of the argument that reinstatement of LeBlanc is prohibited by positive law. In short, the public policy argument does not warrant overturning the arbitration award and therefore lacks merit.

D. Arbitrator's Refusal to Reopen Hearing

VTS's final argument concerns section 11(a)(4). Section 11(a)(4) allows a court to vacate an award if "the arbitrators refused to postpone the hearing upon a sufficient cause being shown therefor or refused to hear evidence material to the controversy . . .." Mass. Gen. Laws ch. 150C, § 11(a)(4). VTS therefore argues that the award must be vacated because "the

Arbitrator refused to hear evidence material[] to the controversy." (Docket Entry # 6, p. 30).

In support, VTS points to an additional incident occurring on February 1, 2018 involving LeBlanc. As set out in an affidavit by VTS Operations Manager Barnet Nkugwa ("Nkugwa"), LeBlanc allegedly reversed into a pole while operating the RIDE sedan, the impact being severe enough to cause injury to the sole RIDE passenger on board. (Docket Entry # 17-2, pp. 5, 8-9). Moreover, LeBlanc allegedly failed to report the accident, which if true, would be grounds for termination under the work rules. (Docket Entry # 17-2, pp. 2, 4). On March 12, 2019, the day before the arbitrator issued his award and after the January 11, 2019 hearing, VTS filed a motion to reopen the hearing "in order for the Arbitrator to consider new evidence that was not available to VTS at the time of the hearing." (Docket Entry # 17-2, p. 2). The new evidence was the affidavit by Nkugwa. The arbitrator reviewed both VTS's motion and the Union's opposition and concluded he would not reopen the case. (Docket Entry # 17-5, p. 3).

The new evidence, however, is not "material" to the controversy within the meaning of section 11(a)(4). Here, the controversy concerned just-cause discharge. The arbitrator determined, based on the evidence presented at the hearing, that VTS failed to show that LeBlanc was given Fair Representation

and Equal Treatment pursuant to the just-cause test. It is therefore not "material" to the controversy whether an additional incident occurred. The procedural infirmities regarding Fair Representation and Equal Treatment do not implicate the substance or deficiencies of LeBlanc's unsafe driving. Accordingly, had the arbitrator known of this additional incident during the arbitration hearing, his award would be the same. For this reason, the arbitrator did not err by refusing to reopen the hearing and his award must stand.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, VTS's motion for summary judgment (Docket Entry # 16) is **DENIED** and the Union's motion for summary judgment (Docket Entry # 15) is **ALLOWED**.

/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge